

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

JUL 30 2025

ARTHUR JOHNSTON
BY_____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**SHANNON CARTER CLARK**                                          **PLAINTIFF**

V.                                          Civil Action # 3:25-cv-567-KHJ-MTP

**MADISON COUNTY, MS**
**CITY OF MADISON, MS**
**CITY OF RIDGELAND, MS**
**CITY OF RICHLAND, MS**
**CITY OF CANTON, MS**
**RANDALL TUCKER (OFFICIAL AND INDIVIDUAL CAPACITY)**
**ROBERT SANDERS (OFFICIAL AND INDIVIDUAL CAPACITY)**
**STEPHEN PATRICK (OFFICIAL AND INDIVIDUAL CAPACITY)**
**BRIAN MYERS (OFFICIAL AND INDIVIDUAL CAPACITY)**
**LASHANDA WILLIAMS (OFFICIAL AND INDIVIDUAL CAPACITY)**
**NICK MCCLENDON (OFFICIAL AND INDIVIDUAL CAPACITY)**
**COTY HAMILTON (OFFICIAL AND INDIVIDUAL CAPACITY)**
**OTHA BROWN (OFFICIAL AND INDIVIDUAL CAPACITY)**
**GENE WALDROP (OFFICIAL AND INDIVIDUAL CAPACITY)**
**JOHN DOES 1-20 (OFFICIAL AND INDIVIDUAL CAPACITY)**          **DEFENDANTS**

## COMPLAINT

### PRELIMINARY STATEMENT

Mark Twain is commonly attributed with saying that "a lie can travel halfway around the world while the truth is putting on its shoes." In this case, no one even bothered to wake up the truth before sending the lie out the door.

This is an action brought under 42 U.S.C. §1983 and the laws of the State of Mississippi to hold the Defendants accountable for their reckless and unlawful violations of the Plaintiff's rights under the United States Constitution, the Mississippi Constitution, and the laws of the State of

1

Mississippi. Beginning on February 5, 2024, and continuing thereafter, the above named entities and their employees (both known and unknown), acting under color of law in their official and individual capacities, and in the course and scope of their employment, published verifiably false and inflammatory statements against Mr. Shannon Carter Clark. These statements included verifiably false allegations of serious criminal conduct, and the publication of this information included unauthorized disclosure of confidential non-public records concerning Mr. Clark, in clear violation of State Law.

The publication of these false statements was accomplished by use of electronic communication, including such as email and internet-based social media chat forums, word of mouth and the use of telephones. Publication was widespread by and among the employees of the above named governmental entities, by and among other law enforcement officers and agencies, as well as to and among civilian members of the general public. Furthermore, at least two of the individual Defendants communicated these false statements to Mr. Clark's employer at the time, during the course of at least two separate telephone conversations. The verifiably false allegations against Mr. Clark were also distributed to potential future employers, thereby damaging Mr. Clark's right and opportunity to work as a law enforcement officer.

Finally, the publication of these false statements included threats of violence and physical harm against Mr. Clark, along with the unjustified and warrantless tracking of his vehicle movements using a system of automated license plate reader cameras (Matrix and/or Flock systems), all of which became known to Clark at the time. These actions placed Mr. Clark in reasonable and justifiable fear for his personal safety.

As a direct and proximate result of the actions above, Mr. Clark was terminated from his employment with the City of Canton Police Department, and despite his diligent and best efforts,

was unable to secure employment in his chosen field of law enforcement for a continuous period of approximately five (5) months, thereby resulting in significant financial damage, along with mental and emotional damage which required the intervention of medical professionals.

Defendants engaged in a widespread and public facing pattern of conduct which placed Plaintiff in a verifiably and highly offensive false light, Defendants unlawfully invaded Plaintiff's privacy by making public disclosure of confidential nonpublic facts, Defendants subjected Plaintiff to emotional distress by placing him in great fear of bodily harm and causing him grave reputational harm, and Defendants acted in reckless disregard for Mr. Clark's well-being as well as his rights guaranteed by the 14th Amendment to the United States Constitution, thus causing injury and damages which are actionable under federal and State law.. At all times relevant hereto, the Defendants were acting under color of law, in the course and scope of their employment, and in reckless disregard for, and showing a deliberate indifference to, the well-established rights of the Plaintiff and to his well-being.

## JURISDICTION AND VENUE

1.      This Complaint seeks remedies pursuant to 42 U.S.C. §1983, for violations of the Fourteenth Amendment to the Constitution of the United States of America, as well as the laws of the State of Mississippi.

2.      Jurisdiction is conferred upon this Honorable Court pursuant to 28 U.S.C §§1331, 1343, and 1367.

3.      Venue is proper before this Honorable Court pursuant to 28 U.S.C. §1391(b) because the Defendants reside and/or are principally located within this District, and the actions giving rise to this Complaint originated and were carried out within this District.

3

## PARTIES

4.    The Plaintiff, Shannon Carter Clark, is an adult resident of Madison County, MS, and at all times relevant hereto, resided in Madison County, MS.

5.    Madison County is a public entity organized under the laws of the State of Mississippi and is the governing authority for Madison County, MS.

6.    The City of Madison is a municipal corporation organized under the laws of the State of Mississippi.

7.    The City of Ridgeland is a municipal corporation organized under the laws of the State of Mississippi.

8.    The City of Richland is a municipal corporation organized under the laws of the State of Mississippi.

9.    The City of Canton is a municipal corporation organized under the laws of the State of Mississippi.

10.    Randall Tucker is the duly elected Sheriff of Madison County, MS, and is being sued in his Official and Individual capacity.

11.    Robert Sanders is an employee and Major/Assistant Chief of the City of Madison Police Department and is being sued in his Official and Individual capacity.

12.    Stephen Patrick is an employee and Captain of the City of Madison Police Department and is being sued in his Official and Individual capacity.

13.    Brian Myers is an employee and Chief of the City of Ridgeland Police Department and is being sued in his Official and Individual capacity.

14.    Lashanda Williams is an employee and officer of the City of Ridgeland Police Department and is being sued in her Official and Individual capacity.

15.     Nick McClendon was at all times relevant hereto an employee and Chief of the City of Richland Police Department and is being sued in his Official and Individual capacity.[1]

16.     Coty Hamilton is an employee and Lieutenant of the City of Richland Police Department and is being sued in his Official and Individual capacity.

17.     Otha Brown is an employee and Chief of the City of Canton Police Department and is being sued in his Official and Individual capacity.

18.     Gene Waldrop is an employee and Chief of the City of Madison Police Department and is being sued in his Official and Individual capacity.

19.     John Does 1-20 are current and/or former employees of the County and Municipal Defendants named in this Complaint, but whose identities and involvement in the actions complained of are not yet capable of confirmation.  Adequate discovery of and from the Defendants is necessary to identify other possible Defendants.

## FACTS

Plaintiff alleges the following:

20.     Beginning on or about February 5, 2024, and continuing thereafter, an "Officer Safety" alert and other similar or like notices, advisories, alerts or other communications, containing verifiably false and inflammatory statements about the Plaintiff, as well as threats of bodily harm, were created, published, forwarded, shared, disseminated, and otherwise transmitted (hereafter collectively referred to as "published") by the Defendants.

21.     These threatening and menacing statements were published in Microsoft GroupMe chat forums created, moderated and/or utilized by law enforcement personnel employed by the Defendant Agencies, to include a Microsoft GroupMe chat forum named "MS

---

[1]     At present, McLendon is serving as the Chief of the City of Pearl Police Department.

Law Enforcement Metro Group" which counted several hundred law enforcement personnel among its membership, and a Microsoft GroupMe chat forum exclusively for members and employees of the City of Madison Police Department. In addition, these statements were published by text message, email, telephone, or other methods of dissemination through official channels within the Agencies, and to private citizens outside the Agencies.

22.     The widespread publication of these false statements and threats was  carried out under color of law and in the course of employment using word of mouth  and other tools of communication which are owned, issued or otherwise authorized for the conduct of official business and/or by personal or other devices being used by persons while on official duty, or while off the clock but nonetheless in their respective capacity as a law enforcement employee or officer, to conduct activity under color of law.

23.     These unverified and blatantly false statements and threats masquerading as urgent "Officer Safety" alerts were published by and among officers and employees within the above named Agencies, to the hundreds of law enforcement members of the GroupMe chat forums, as well as to private citizens, thereby recklessly placing the Plaintiff in a false light, and further placing the Plaintiff in fear for his life and safety.

24.     These false statements were first published by a member or administrator of the MS Law Enforcement Metro Group chat forum, reasonable believed to be Defendant Coty Hamilton, with the knowledge of, and approval or acquiescence of, Nick McLendon, then the Chief of Police for the City of Richland and a fellow member of the MS Law Enforcement Metro Group chat forum. A copy of the initial "Officer Safety" alert published to the MS Law Enforcement Metro Group chat forum on Monday February 5, 2024 is set forth below:

6

## ****Officer Safety *****

**OFFICER SAFETY** USE CAUTION**

Shannon C. Clark was fired from Canton PD this morning. He supposedly went to the VA this weekend and told them he was an undercover FBI agent working in Canton. He also told them he'd just shot into a Madison PD car. Madison, as of this email, was contacted and stated that they were not aware of any PD vehicle being shot into; however, please use caution if contact is made with this individual. He has military training. I have not been made aware of any pending charges as of now. Be safe everyone!

Plaintiff denies and disputes the content and import of this "Officer Safety" alert, in particular:

    A. As of February 5, 2024 when this was first published by Defendants, Plaintiff had indisputably NOT been fired from Canton PD;

    B. Plaintiff did not claim to be an "undercover FBI agent working in Canton."

    C. Plaintiff did not state "he'd just shot into a Madison PD car," nor, for that matter, has Plaintiff ever shot or attempted to shoot into a Madison PD car, or any car.

    25.    In addition to the wide spread publication of these false statements to the several hundred law enforcement members of the MS Law Enforcement Metro Group chat forum, these statements were also uncritically accepted and circulated to employees of the City of Richland Police Department, City of Ridgeland Police Department, City of Madison Police Department, and Madison County Sheriff Department. A second variation of the Alert published by Defendants is copied below:

7



26.     Each of these Defendant agencies advised their officers to be on the lookout for

Shannon Clark, and to initiate a felony takedown and apprehension with at least three officers

should Clark be encountered[2], all on the basis of the unverified and blatantly false allegations

against Clark, a fellow law enforcement officer himself.

27.     No meaningful attempt was made by Defendants to contact Clark for explanation

or to verify or otherwise establish the credibility, original source, basis or veracity of these false

statements prior to widespread publication and distribution.

28.     Contextually, it is important to know that early on the morning of Sunday

February 4, 2024, the Plaintiff drove from his residence near Gluckstadt, MS to the Veterans

---

[2] A "felony takedown" is a multi-officer confrontation with a potentially dangerous suspect (of which the Plaintiff
was not) which seeks to apply overwhelming force to subdue the suspect. Violent, sometimes fatal, encounters are
not unexpected. From his own law enforcement training, Clark knew what a felony takedown involved and
reasonably feared for his life and/or personal safety because of the Defendants' reckless attempts to provoke a
totally unjustified confrontation with him. This fear persisted for days and weeks while this reckless command went
unaddressed by those who published it, based on verifiably false allegations.

Affairs Medical Center in Jackson, MS.  Plaintiff was and still is a patient of the VA medical program because of his prior military service and a service connected partial disability.

29.     Plaintiff had developed concerns arising from his employment with the Canton Police Department regarding certain patterns and practices which he regarded as improper, unethical, and possibly illegal, and it was these concerns which led him to the VA Medical Center on the morning of February 4, 2024.  Plaintiff was seeking the independent counsel of Ryan Gholson, Assistant Special Agent in Charge of the Office of Inspetor General, and an instructor from his Police Academy class. The purpose of his visit on February 4, 2024 was to try arrange a meeting with Special Agent Gholson, as an objective third party, to talk through his concerns regarding the Canton Police Department.

30.     Upon arrival, Plaintiff encountered a VA police officer who was screening visitors at the entrance, believed to be Ricky Davis.  Plaintiff briefly explained the purpose of his visit without divulging the underlying details of his work related concerns.  Davis informed Plaintiff that the Inspector General was not available but that he could talk with a VA Police supervisor.

31.     Davis showed Clark to private room inside the VA and put Clark in contact with an individual who identified himself as a supervisor level officer.  This was a telephone conversation and not in person.

32.     Davis then left the room, but left the door partially open and loitered near the door to eavesdrop on Clark's conversation.

33.     The individual on the other end of the line with Plaintiff was aggressive in his interrogation of Plaintiff regarding the nature and purpose of his visit.  Plaintiff refused to

divulge the full details and purpose of his visit, other than to reiterate that he preferred to speak only with the Inspector General whom he remembered from his Police Academy class.

34.    After growing frustrated, and feeling unreasonably interrogated, the Plaintiff stepped away and phoned his Father. Plaintiff's Father advised Clark to end the conversation, leave the facility, and try again another day to get in touch with Special Agent Gholson to discuss his work related issues. Plaintiff then volunatrily left the facility without incident.

35.    Sometime after Clark left the VA Medical Center that morning, someone at the VA Medical Center (likely one of the two people Clark spoke with), reached out to the MS National Guard.  Information later provided to Clark confirmed that VA Police Officer Davis also called Chief Otha Brown of the Canton Police Department.  Davis is also believed to have spoken to Troy Nix, then a policeman with Richland Police Department and partner of Coty Hamilton on the Richland PD Special Response Team (SRT), and possibly to Hamilton himself, to share some "tea" regarding Clark's visit to the VA Medical Center. Nix had previously worked with Ricky Davis at the VA Medical Center.

36.    Later on February 4, 2024, someone on staff for the MS National Guard sent an elctronic message to 1SGT Kevin Gilbert, the point of contact for the National Guard Unit of which Clark was a member, asking Gilbert to look further into the matter.

37.    The message transmitted from an as yet unknown person with the MS National Guard to 1SGT Gilbert contained the following information:

> A. [From an unknown person with MS Army National Guard to 1SGT Gilbert]
>
>> "Below is the information I just received from the VA Police on Shannon C. Clark, he is in the Co A 150 BEB. Can you please look into this issue. Thanks."
>
> B. Next, the information received "from the VA Police" states as follows:

"Shannon came into the Jackson VA Sunday morning asking to talk only to the Chief of Police of the OIG. He was then ask if some else could possibly help him. Shannon at this point became very evasisve with answering our questions and started saying things pertaining to the effect of violating his security clearance. He was alleging he's a FBI agent and that he now works for Canton Police. At this point he was advised that the Chief was not available nor was the OIG but he was allowed to talk with the Lieutenant on shift. This conversation did not reveal any further information but from our experience with interacting with Shannon we're under the belief that he needs some type of medical attention. This haven't been verified yet but he was allegedly shooting a police cars in Madison." [all errors are in the original]

C.    The Plaintiff strongly denies and disputes the allegations which were

provided by the VA Police to the National Guard and others, as being either the product of a

misunderstanding, a miscommunication, of an eavesdropper who misheard, a fabrication,

and otherwise lacking anycredible factual basis, in particular:

1. "Shannon . . . started saying things pertaining to the effect of violating his security clearance."

2. "He was alleging he's a FBI agent . . ."

3. ". . . from our experience with interacting with Shannon we're under the belief that he needs some type of medical attention."

4. "This haven't been verified yet but he was allegedly shooting a police cars in Madison."

38.    1SGT Gilbert, upon receiving this information, contacted the City of Richland

Police Department, on the mistaken belief that Clark was still employed there, to inquire if Clark

was okay and accounted for. Gilbert provided the above information to the Richland Police

Department.

39.    Based on this information, two officers with the City of Richland Police

Department paid a visit to the Richland home of Clark's girlfriend. They shared this same

information with the girlfriend. During all this time, Clark was at his residence near Gluckstadt,

11

MS where he had returned immediately after leaving the VA Medical Center, but no one from Richland PD made contact with the Plaintiff.

40.    The Richland PD officers stated there was no formal investigation into the allegations they received, and that they did not want to be involved any further with the matter. They provided the girlfriend with 1SGT Gilbert's contact information and suggested getting in touch with him.

41.    Clark's Father then contacted 1SGT Gilbert on the afternoon of September 4, 2024, verified that Clark had gone to the VA breifly that morning, and had returned home soon after, where he remained.  Gilbert was further advised that the allegations of shooting at police cars and impersonating an FBI agent were blatantly inaccurate claims,[3] and that Clark was safe, well and at home.  1SGT Gilbert did not give any credence to the anonymous VA allegations, and this concluded what was essentially a wellness check on Clark by the National Guard, and there was no further involvement by the Guard, insofar as Clark knows or is aware.

42.  On Monday September 5, 2024, however, the lie was let out the door when the first of the Officer Safety alerts was published by the Defendants via the MS Law Enforcement Metro Group chat forum.

43.    Not a single Defendant reached out to Clark in an effort to determine whether any of the allegations had any basis in fact prior to commencing their widespread information operation against him, even though (a) the most serious allegation (shooting police cars in

---

[3] Two of the concerns Clark had with his work at Canton Police Department, and which led him to seek independent advice from a familiar third party at the VA Medical Center, were that (1) Clark had personally observed and confirmed the presence in Canton of undercover FBI personnel, and a fellow officer at Canton PD had advised Clark on several occasions that a federal investigation into Canton Police Department practices was underway; and, (2) Clark was personally aware of what he considered to be questionable practices regarding the investigation and reporting of gun related and other crime occurring in Canton.  Clark had raised his concerns with Canton PD to no avail.

Madison) was admittedly unverified by the anonymous original source at the VA Medical

Center, and by the author of the "Officer Safety" alert (b) the first "Officer Safety" alert was

published more than 24 hours later on Monday July 5, 2024 and acknowledged that Madison

Police had been contacted and they had no report of police cars having been shot into the day

before, and (c) there were no pending charges against Clark for any such criminal activity.

Never let the facts get in the way of a reckless law enforcement operation.

44.    As a cherry on top of the reckless information operation being carried out by the

Defendants against the Plaintiff, one or more Defendants published a booking intake record from

Plaintiff's 2019 arrest on a non-violent misdemeanor charge, which had long ago been dismissed

without prosecution by the Municipal Court for the City of Madison, and all records related

thereto, including specifically all records related to his arrest, were ordered to be expunged. This

booking intake record is believed to have been retrieved and published by or with the assistance

of the Madison County Sheriff's Department because this record was originally created and

maintained by the Sheriff's Department in 2019 as part of its intake procedure at the Madison

County Detention Center where Plaintiff was taken following his arrest.

45.    This intake record was grossly altered to include false handwritten statements

before being published by and among the Defendants, in addition to containing internally

erroneous facts regarding the Plaintiff. This confidential, nonpublic intake record was

improperly accessed and used, in violation of Mississippi Law, to publicly portray the Plaintiff as

an armed and dangerous, now unemployed mad man, and it contains the following verifiably

false or misleading statements:

      A. The intake record contained the following handwritten notes on its face:
**"Subject Dangerous"**      **"Possibly armed will shoot at police"**      **"Ex-Cop Richland PD & Canton PD"**      **"Send more than one Deputy"**;

B. Clark's age on this document is listed at 28 years old, while his birth date is correctly listed as 02/24/1995. Given the intake date of 12/17/2019, Clark would have been 24 years old at the time of intake; he was 28 years old when this intake record was published in connection with the Officer Safety alerts.

C. Under Emergency Contact information, Clark's father is listed as emergency contact, along with an employer reference of "Bayou Boys" and occupation is listed as landscaping; in point of fact, the Plaintiff's father has been a licensed attorney since May 1988 and has never worked for "Bayou Boys" or in landscaping (other than as a laborer for a landscape business in Hattiesburg, MS for one summer during college in about 1982).

D. In the Description, Plaintiff is described as having a tattoo on his right arm, when in fact Plaintiff had no tattoo on his right arm in December 2019.

46.    The publication of this previously expunged record is a clear violation of Mississippi law and represents a clearly unauthorized and unlawful use of such confidential, nonpublic records.

47.    At the time these false statements were published, Clark was in fact employed as a patrol officer for the City of Canton Police Department.

48.    The false statements included a claim that Clark had been fired from this job at Canton PD on the morning of February 5, 2024, which was verifiably false when these statements were published.  In fact, as noted below, on or about February 6, 2024, Defendants Robert Sanders and Stephen Patrick were informed by Canton Police Assistant  Chief Johnson that Clark had not been fired by Canton PD, but yet they persisted in disseminating these false statements about the Plaintiff.

49.    Clark and his attorney promptly requested the Chief of Canton Police Department to intervene and correct the false information, and to help stop the ongoing violation of Clark's rights, but Chief Otha Brown refused.

50.    Mr. Clark, and his attorney, through an intermediary known personally and professionally by Defendant Myers, asked Chief Brian Myers of the City of Ridgeland Police

Department, to intervene, investigate and verify these false allegations, and he too refused, citing the allegedly reliable nature of the information about Clark even though Chief Myers did not know the original source of the information upon which the false allegations against Clark were based nor the circumstances underpinning the publication of false statements against Clark.

51.    Mr. Clark and his attorney personally went to the City of Madison Police Department in an effort to speak with Capt. Stephen Patrick in order to rebut these false statements, but were turned away, with a promise that Capt. Patrick would call Mr. Clark and his attorney the following day by Noon to discuss.  This promised phone call never came.

52.    On or about February 9, 2024, Mr. Clark's Attorney prepared and served on the law enforcement department Defendants a Request to Cease and Desist letter which detailed the false statements being widely published and circulated by the Defendants, and requesting the Defendants to cease and desist from continued publication.

53.    Neither Plaintiff nor his Attorney received any response from the Defendants regarding the Request to Cease and Desist, with one limited exception.  A representative of the insurer for the City of Ridgeland telephoned Plaintiff's attorney and stated the Ridgeland Police Department reported the initial allegations were promptly investigated, determined to be false, and disregarded.   This is false.

54.    Defendants Robert Sanders and Stephen Patrick telephoned the City of Canton Police Department on at least two occasions after the initial publication of false allegations against Clark to reiterate these false claims, in an effort to further disparage Mr. Clark's reputation, and to have him terminated from his job as a Canton Police Officer. These attempts failed, at least initially.

55.    The first telephone contact was made by Major Robert Sanders, who spoke with Assistant Chief Johnson of the Canton Police Department.  This was on or about February 6, 2024.

56.    Assistant Chief Johnson confirmed to Major Sanders that Mr. Clark had not been fired from his job as a Canton Policer Officer, despite the false statements being published by Sanders and other Defendants to the contrary.

57.    Assistant Chief Johnson also rejected the false claims of Mr. Clark having shot at police, of being armed and dangerous, of being willing to shoot at police, as being the product of rumor, hearsay, and lacking any legitimate evidentiary basis in fact.

58.    Instead of dropping the matter, and intervening to halt the continued publication and circulation of these verifiably false statements in violation of Mr. Clark's rights, Major Robert Sanders doubled down.  He placed a second call to Assistant Chief Johnson, this time including Capt. Stephen Patrick on the call.  Assistant Chief Johnson is an African American, as is Capt. Stephen Patrick, and the two had a friendship and good working relationship with one another, according to what Assistant Chief Johnson related to Clark.  Major Sanders was apparently determined to convince Assistant Chief Johnson that the lies about Clark were truth, by whatever means necessary.

59.    During this second conversation, Major Sanders, with the assistance of Capt. Patrick, again attempted to persuade Assistant Chief Johnson that the verifiably false statements being published by and among the Madison Police Department and other Defendants were nonetheless accurate and actionable.  Assistant Chief Johnson again rejected these claims as hearsay and lacking any basis in fact.

16

60.    Upon learning of these conversations between Major Sanders, Capt. Patrick and Assistant Chief Johnson, Mr. Clark again asked his Chief of Police, Otha Brown, to intervene with the Madison Police Department and the other Defendants to confirm that Mr. Clark had not in fact been fired, to confirm that Mr. Clark was in fact still employed in good standing by Canton Police Department, and to help stop the continuing publication of the false statements by Defendants and the ongoing threat to apprehend Clark by felony takedown. Chief Otha Brown, however, flatly refused to intervene, telling Mr. Clark to just ignore the matter and let it run its course.

61.    Chief Brown also initially assured Clark he was in no danger of termination based on these false statements, but within days, he terminated Mr. Clark's employment on the erroneous pretext of Mr. Clark allegedly failing to report for a single shift on Sunday February 11, 2024, without prior notification.

62.    In fact, Mr. Clark had given prior notification by direct text message of his proposed absence to Chief Brown, and to his shift supervisor, who acknowledged and approved the absence for this family emergency.[4] It had been custom, practice and policy for Mr. Clark to notify his shift supervisor and the Chief of Police by text message anytime a work absence was necessary or anticipated.

---

[4] Mr. Clark's Grandfather, the late Judge Shannon Clark of Waynesboro, MS had been in poor health, and on this occasion, had taken an ominous and sudden turn for the worse. At his father's request, Mr. Clark requested leave to travel with his father to Waynesboro on February 11, 2024 to visit Judge Clark, out of concern this might be the last time Mr. Clark would see his Grandfather alive. Mr. Clark notified the Chief as well as his Shift Supervisor of this family emergency as soon as was practical under the circumstances. Mr. Clark's Shift Supervisor acknowledged this notification, and approved Mr. Clark's request. Chief Brown ignored this request. Judge Clark would never recover, and later died on April 4, 2024.

63.     Chief Brown ignored and never acknowledged this notification from Mr. Clark, claiming later that he never received this notification, which is disputed. Chief Brown had never failed previously to receive and/or acknowledge direct text messages from Mr. Clark; conveniently, however, Chief Brown claimed he never received this particular notification.  As a result, Chief Brown terminated Mr. Clark's employment as of February 12, 2024 on the pretext of Clark failing to provide prior notification of this intended absence.

64.     Given all the circumstances at the time, Clark offered to resign, but Chief Brown refused this offer, preferring a pretextual termination to an amicable departure.

65.     After being terminated, Plaintiff spent several months applying for law enforcement jobs but was repeatedly rejected, including the withdrawal of an offer from East Baton Rouge Parish Sheriff Department, specifically based on the false allegations being repeatedly published by the Defendants.

66.     Despite regular and repeated efforts to obtain other employment in law enforcement, a field in which Plaintiff was amply qualified by education (Bachelor's Degree in Criminal Justice from the University of  Mississippi; Internship with the United States Marshals Service) and training (State of Mississippi certified law enforcement officer, and prior employment as a law enforcement officer since June 2022), it was not unitl July 2024 that he was able to secure employment, this time with the Mississippi Department of Corrections as a law enforcement officer.

## CAUSES OF ACTION

67.     Plaintiff hereby incorporates by reference and re-alleges each preceding paragraph in this Complaint.

## FEDERAL CONSTITUTIONAL CLAIMS (42 U.S.C. §1983)

**I.    14th Amemdment Due Process (Against All Defendants)**

68.    Each of the Defendants contributed to and/or directly participated in the publishing of verifiably false, stigmatizing statements, leading to Plaintiff's termination and the imposition of employment burdens, depriving him of liberty and property interests without due process.

69.    This claim rests on the "stigma plus" doctrine which recognizes the Plaintiff's well established right to engage in his chosen profession without a burdensome stigma to his good name and reputation being imposed by state officials acting under color of law. Paul v Davis, 424 US 693 (1976).

70.    Defendants, acting under color of state law, and in the course and scope of their employment as law enforcement officers, made false statements about Plaintiff that were injurious to his reputation, and which were *per se* damaging as well as damaging in fact, including the following false claims:

A. That Shannon Clark was fired from the Canton Police Department on the morning of February 5, 2024;

B. That Shannon Clark, on the morning of February 4, 2024, had shot at police and/or shot into police cars in the City of Madison;

C. That Shannon Clark presented himself to the Veterans Affairs Medical Center in Jackson, Mississippi on the morning of February 4, 2024 falsely claiming to be an agent for the Federal Bureau of Investigation;

D. That Shannon Clark was armed, dangerous, and willing to shoot at police.

71.    These statements were capable of being proved false when made, and are in fact false, yet Defendants failed to verify, investigate or otherwise corroborate any of the anonymous hearsay allegations they used to harm the Plaintiff.

19

72.    The false statements were published by and among each named Defendant, in both official and individual capacities, and by and among the employees of each municipal and county law enforcement agencies, and shared with civilian members of the community where Plaintiff lived and worked, to wit:

A. The initial "Officer Safety" alert was published by Richland Police Department supervisor Coty Hamilton, by and with the knowledge and/or approval or acquiescence of the Chief of Police, Nick McLendon, and was based on unverified anonymous hearsay.

B. The "Officer Safety" alert founds its way to the Ridgeland Police Department, the Madison Police Department and the Madison County Sheriff's Department, where it was further amended and circulated.

C. Officer Lashanda Williams of the Ridgeland Police Department published these false statements to the on-duty officers of the Department at a shift change briefing, with the altered intake sheet from the Madison County Sheriff's Department included.

D. Chief Brian Myers, the primary policy maker for Ridgeland Police Department, confirmed Williams' involvement and supported her actions when he advised a third party inquiring on Clark's behalf that he considered the unverified hearsay allegations to be reliable, and that he further considered Clark a legitimate subject for apprehension should Clark be found within Ridgeland Police jurisdiction.

E. Major Robert Sanders and Captain Stephen Patrick of the Madison Police Department continued the information operation against Clark by contacting Canton Assistant Chief Johnson in an attempt to further disparage Clark's personal and professional reputation. This conduct was carried out with the obvious acquiescence of Madison Police Chief Waldrop and/or with the approval of Major Sanders as the Assistant Chief and primary policy maker for Madison Police Department.

F. The Madison County Sheriff's Department improperly accessed and published a confidential, non-public intake record, which was altered and used to further the false narrative that Clark was an armed and dangerous ex-police officer who had shot at police, and was willing to continue shooting at police. Adequate and thorough discovery is needed to identify the specific person or persons responsible for accessing and publishing this record, and upon whose authority this was allowed.

G. Canton Police Chief, Otha Brown, had actual knowledge of the false claims being published about his employee, Clark. He also had actual knowledge of the phone calls to Assistant Chief Johnson, first by Madison Police Major Robert Sanders, and second by Major Sanders and Captain Stephen Patrick. Despite Clark's repeated pleas for Chief Brown to intervene, Chief Brown refused and chose instead to just let the damage continue mounting until it hopefully played out.

20

H. After initially assuring Clark these false allegations would not affect his employment, Chief Brown terminated Clark's employment on February 12, 2024 on the basis of a false pretext.

I. On or about February 9, 2024, the Plaintiff, by and through his Attorney, served a Request to Cease and Desist on the Chief of Police for each municipal department, and on the Sheriff of Madison County. This Cease and Desist Request detailed the false statements being published about Clark, thereby providing further actual notice of the harms being perpetrated by their respective agencies. Unfortunately, this Cease and Desist Request was roundly ignored and the continued violation of Clark's well established constitutional rights was allowed to continue unabated.

J. Throughout this information operation, Clark learned and was informed that these false allegations had spread to the surrounding communities in Rankin and Madison Counties, in part because of the wide spread publication to the MS Law Enforcement Metro Group internet chat forum, and in part because officers within certain of the Defendant police departments were sharing this information with persons outside their respective departments, including to spouses and partners.

73.     The false statements accusing the Plaintiff of having engaged in felonious conduct against the police, of being a continuing danger to shoot police, are *per se* damaging to Plaintiff, without the need for further proof of economic or employment related harm.

74.     The *per se* damaging nature of these stigmatizing statements notwithstanding, the conduct of Defendants in fact imposed tangible and material burdens on Plaintiff, including:

A. The termination of his employment as a Canton police officer on a false pretext;

B. Causing or allowing the false, stigmatizing statements to be widely circulated among the law enforcement community, including to the East Baton Parrish Sheriff's Department and to an Agent of the Drug Enforcement Administration in Baton Rouge, LA, thereby resulting in the loss of a job opportunity previously pledged to Mr. Clark;

C. Causing or allowing the false, stigmatizing statements to be widely circulated among the public and law enforcement community, thereby forcing Mr. Clark, to his detriment, to disclose these false and stigmatizing claims to other prospective employers in the course of applying and interviewing for other law enforcement employment, and causing him to suffer a month's long period of unemployment in his chosen field.

75.     The combination of the false and stigmatizing statements together with the

tangible burdens imposed by state action constitutes a "stigma-plus" deprivation of Plaintiff's

liberty and property interest without due process of law.

76.     Defendants provided Plaintiff with no hearing or other opportunity to clear his

name before or after making the false and defamatory statements and imposing these burdens,

and in fact, ignored or rejected Plaintiff's repeated requests for help in clearing his name, thereby

depriving him of liberty and property interests without due process, in violation of the 14th

Amendment to the United States Constitution.

77.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered and

continues to suffer substantial damages, including but not limited to loss of employment, damage

to professional reputation, emotional distress, and mental anguish.

78.     The Defendants at all times acted under the color of law and in the course and

scope of their employment, in reckless disregard for Mr. Clark's well established due process

rights guaranteed by the 14th Amendment.

## Municipal Liability

### Policy, Custom or Practice

79.     County and Municipal governmental entities can be held liable under 42 U.S.C.

§1983 if a constitutional violation is a direct consequence of policy, custom, practice or failure to

properly and adequate train personnel. Monell v. Department of Social Services, 436 U.S. 658

(1978).

80.     This Complaint alleges that Defendants maintained a custom or practice of taking

law enforcement action against individuals without reasonable supervisory oversight and without

taking basic investigative steps designed to confirm whether there is individualized reasonable

suspicion or probable cause to believe the targeted individual has engaged in criminal conduct, leading to the kind of reckless and unjustified conduct that was directed toward the Plaintiff in this case.

81.    The actions taken against the Plaintiff by every single governmental Defendant clearly and obviously evidences a custom and practice, and a culture, of policing which ignores basic, fundamental investigative work and which ignores legal requirements to establish probable cause before taking enforcement action against an individual.

82.    A law enforcement agency that allows and supports the reckless violation of constitutional rights on the basis of unverified and anonymous hearsay allegations, supplemented by additional false claims gratuitously supplied by law enforcement itself (the false claim that Clark had been fired the morning of February 5, 2024, that he was armed and dangerous, willing to shoot at police) as was the case here, without any meaningful investigative effort to verify the nature and original source of the allegations, much less the truth and veracity thereof, even in the face of obvious contradictions (allegations not verified, no known charges, no confirmation of police cars being shot in Madison), very strongly points to a custom and practice of reckless policing.

**Failure to Train/Supervise**

83.    The conduct of the individual Defendants which directly caused a violation of the Plaintiff's well established rights represents an obvious failure by each of the law enforcement entities to adequately train and supervise their personnel on the use and verification of anonymous, hearsay statements prior to initiating police action against an otherwise innocent person. This failure to adequately train and supervise shows a deliberate indifference to the

probability that law enforcement action will be carried out in a manner likely to cause a violation of constitutional rights.

84.    There is also a clear and obvious failure to train and supervise personnel on the proper, and in this case, improper, access and use of confidential, non-public records that were previously the subject of a lawful expungement order by a court of competent jurisdiction.

85.    The use by Defendants of unverified but provably false hearsay allegations, coupled with the unlawful use and publication of a confidential non-public record, to stigmatize and burden the Plaintiff with regard to his employment, and place him reasonably in fear of great bodily harm, demonstrates a clear and obvious lack of adequate training and/or supervision regarding the establishment of valid reasonable suspicion or probable cause PRIOR to targeting an innocent individual not engaged in criminal activity.

**Policy Maker Conduct**

86.    Governmental liability may also arise where the head of an agency or other person of high rank, with policymaking authority, directly participates in the violation of one's constitutional rights, such that the offending conduct may reasonably be considered the policy of the governmental entity itself.  Valle v. City of Houston, 613 F.3d 536 (5th Cir. 2010).

87.    Here, the high ranking officials with authority in law or fact to establish policy for the departments, either directly participated in the publishing of verifiably false statements about the Plaintiff (Defendants McLendon, Myers, Sanders), or had actual knowledge and acquiesced to the publishing of false statements about the Plaintiff (Defendants McLendon, Myers, Sanders, Brown), and/or had actual knowledge of the offending conduct and refused to intervene in order to halt the violation of Plaintiff's well established rights (Defendants McLendon, Myers, Sanders, Waldrop, Brown, Tucker), directly leading to the violation of Plaintiff's constitutional

24

rights and causing Plaintiff damage in the form of reputational and professional harm and loss of employment opportunities in his chosen filed, as well as placing Plaintiff reasonably in fear for his safety and well-being, causing great mental and emotional stress.

### Individual Liability

**Direct Participation**

88.    Each of the named individual Defendants, acting under color of law, directly participated in the actions that resulted in the violation of Plaintiff's constitutional rights, either by personally publishing or otherwise disseminating the false and stigmatizing statements against Plaintiff, or, by acquiescing in the publication and dissemination of the false and stigmatizing statements after having actual notice and knowledge of the offending conduct, thus demonstrating a deliberate indifference to the constitutional rights of the Plaintiff. Doe v. Ferguson, 128 F.4th 727 (5th Cir. 2025).

89.    The facts set forth in this Complaint, which the Plaintiff incorporates and re-alleges herein by reference, more than adequately demonstrate that individual Defendants are liable to Plaintiff based on their direct participation in the publishing of false, stigmatizing statements against Plaintiff, and/or their acquiescence to the publication of false statements and deliberate indifference to the Plaintiff's constitutional rights.

**Failure to Intervene/By-Stander Liability**

90.    It is well established that law enforcement officers have a duty to intervene and prevent others from depriving individuals of their constitutional or civil rights; and the failure to intervene can render the "by-stander" officer liable under §1983 for a violation of rights that is traceable to his or her own inaction. Estate of La'Mello Parker v. Mississippi Dept. of Public Safety et al., ____ F.4th ____ Slip op. (5th Cir. June 6, 2025).

91.    Every individual Defendant in this case, in view of their actual knowledge as well as the Plaintiff's specific pleas for intervention, had a duty to intervene and prevent the violation of Plaintiff's well established constitutional rights, yet no one did. Their failure to intervene is as much a direct cause of the violation suffered by Plaintiff as deliberately participating in the violation itself.

92.  Plaintiff hereby incorporates by reference and re-alleges all preceding paragraphs of the Complaint in support of the claim that individual Defendants are liable to the Plaintiff for acting as mere by-standers and refusing or failing to intervene to prevent other law enforcement officers from committing a violation of Plaintiff's constitutional rights.

## STATE LAW CLAIMS

93.    Plaintiff hereby incorporates by reference and re-alleges each preceding paragraph in this Complaint.

94.    Plaintiff's State Law claims are subject to the provisions of the Mississippi Tort Claims Act, Miss. Code Ann. §11-46-1 et seq. (1972), *as amended*  (hereafter "MTCA").

95.    Plaintiff properly served a Notice of Claim on each governmental entity in accordance with the MTCA within one year of the first act of tortious conduct being carried out by the Defendants. Miss. Code Ann. §11-46-11 (1972), *as amended*.

96.    Pursuant §11-46-11 of the MTCA, Plaintiff files this Complaint within the period allowed after giving Notice of Claim to the governmental entity Defendants.

97.    The claims asserted by Plaintiff arise from actions and conduct carried out by employees of the governmental entity Defendants in the course and scope of their employment, thereby making the governmental entity Defendant's liable for the tortious actions of their employee and agents, pursuant to §11-46-5(1), (3) of the MTCA.

98.    The claims asserted by the Plaintiff are within the coverage of the MTCA because these claims are unintentional wrongs which do not require proof of malice or intentional conduct, and are specifically not "fraud, malice, libel, slander, defamation or any criminal offense." Miss. Code Ann. §11-46-5(2) (1972), *as amended*; Mark v. City of Hattiesburg, 289 So.3d 294 (Miss. 2020); Weible v. Univ. of S. Miss., 89 So. 3d 51, 280 Ed. Law Rep. 1201 (Miss. App. 2012).

99.    The Defendants are not entitled to immunity under the MTCA for performing their law enforcement activities because the claims asserted by the Plaintiff allege actions and conduct which demonstrate "a reckless disregard of the safety and well-being of" the Plaintiff who was "not engaged in criminal activity at the time of injury." Miss. Code Ann. §11-46-9(1)(c) (1972), *as amended.*

## II.    False Light Invasion of Privacy

100.    Plaintiff hereby incorporates by reference and re-alleges each preceding paragraph in this Complaint.

101.    False light invasion of privacy is a cause of action recognized under Mississippi Law and applies when someone "gives publicity to a matter concerning another that places the other before the public in a false light," and liability attaches "if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Prescott v. Bay St. Louis Newspapers, Inc., 497 So.2d 77, 79 (Miss. 1986).

102.    The cause of action for false light invasion of privacy is a separate and distinct claim from the torts of defamation, libel or slander, and "[i]t is enough [for recovery] that he is

given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." <u>Prescott v. Bay St. Louis Newspapers, Inc.</u>, 497 So.2d at 80.

103.    While recovery in a defamation, libel or slander claim is for reputational harm, damages in a false light invasion of privacy claim are recoverable for the mental or emotional harm caused by the publication of false statements; and a false light invasion of privacy claim does not require proof of malice, intent or other malcious conduct and is, therefore, not one of the specific wrongs excluded by the MTCA.

104.    The Defendants published false information about Plaintiff, including by unlawful publication of a confidential, non-public record altered by the Defendants themselves, to make false, highly inflammatory and objectively unreasonable and offensive claims against Plaintiff, thereby threatening Plaintiff with a violent confrontation and placing him reasonably in fear of great physical harm, directly causing Plaintiff to suffer mental and emotional distress. Defendants did so with knowledge of or in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff was placed, and in "reckless disregard" for his safety even though Plaintiff was "not engaged in [any] criminal activity [whatsoever] at the time of injury."

**III.    Invasion of Privacy – Public Disclosure of Private Facts**

105.    Plaintiff hereby incorporates by reference and re-alleges each preceding paragraph in this Complaint.

106.    Plaintiff was arrested by the City of Madison Police Department on the night of December 17, 2019 and charged with non-violent misdemeanor conduct.

28

107.    Plaintiff was taken to the Madison County Detention Center and held briefly until released.  As part of the standard intake procedure, an Intake Report was created which included Plaintiff's photograph and other basic information such as name, address, description, etc.

108.    The charges against Plaintiff were never formally prosecuted by the City of Madison, and by Order of the Municipal Court for the City of Madison dated June 18, 2020, the charges were "fully and finally dismissed" and "all arrest and other records related to [these charges were] expunged in their entirety, as though these charges and the alleged incident complained of by the [City of Madison] had never occurred."

109.    The effect of the dismissal of charges and the expungement of all arrest and other records is to restore the Plaintiff to the status he or she occupied prior to the arrest, as though he had never been arrested and charged.  Moreover, a copy of the expungement order is only to be "maintained in a separate confidential database" under the control of the Mississippi Criminal Information Center, and shall only be accessible "upon written request by a district attorney, a county prosecuting attorney, a municipal court prosecuting attorney, the Attorney General of Mississippi and the Mississippi Law Enforcement Standards and Training Board," and may only "be used for the purpose of determining habitual offender status [in a subsequent proceeding involving the same individual] and for the use of the Mississippi Law Enforcement Standards and Training Board in giving or retaining law enforcement certification."  Miss. Code Ann. §45-27-21 (Supp. 2006).

110.    There is no lawful exception permitting any of the Defendants herein from accessing, altering and publishing a confidential, nonpublic record related to a previously expunged matter, especially under the circumstances such as here where Plaintiff was not engaged in any criminal activity and was falsely accused of having committed and being willing

29

to commit violent criminal offenses against the police. See Stewart v. Miss. Bar, NO. 2009-BR-01954-SCT (Miss. Jan 06, 2011) (recognizing the confidential nature of expunged records and that State laws "allow expunged records to be used, or asked about, only in certain instances."); Miss. Code Ann. §99-19-71(3) (1972), *as amended* (expunged records are "nonpublic records" to be retained by the Miss. Criminal Information Center "solely for the purpose of determining whether, in subsequent proceedings, the person is a first offender.").

111.    As a direct and proximate result of the Defendants having engaged in the unlawful public disclosure of a private fact, to-wit the confidential, non-public expunged record, Plaintiff was subjected to publicity "that would be highly offensive to a reasonable person" and suffered medically cognizable emotional and mental distress as a result, in addition to the pecuniary loss related to his employment. Candebat v. Flanagan, 487 So.2d 207, 211-212 (Miss. 1986).

**IV.    Negligent Infliction of Emotional Distress**

112.    Plaintiff hereby incorporates by reference and re-alleges each preceding paragraph in this Complaint.

113.    Defendants' conduct in publishing false and inflammatory statements about Plaintiff, placing him reasonably in fear of physical harm, publicly placing him in an objectively offensive false light, causing him reputational harm, along with pecuniary harm related to his employment, in reckless disregard for his well-being even though Plaintiff was not engaged in any criminal activity, caused Plaintiff to suffer emotional and mental distress that was "medically cognizable and requiring or necessitating the assistance of those in the medical profession." Collins v. City of Newton, 240 So.3d 1211, 1221 (Miss. 2018).

114.    The Plaintiff in fact required and obtained medical treatment following the character assassination and threats of physical harm perpetrated by the Defendants against him, and this treatment was for the emotional and mental distress that was both medically cognizable and the direct result of the Defendants' harmful conduct.

115.    The mental and emotional distress suffered by Plaintiff as the direct and proximate result of the Defendants' wrongful conduct was a reasonable and entirely foreseeable consequence of their actions.

116.    Defendants' aforementioned conduct, carried out in the course of scope of their employment, amounts to the negligent infliction of emotional distress, and for which, Plaintiff deserves to be compensated.

## RELIEF SOUGHT

As a direct and proximate result of the conduct carried out against the Plaintiff by the Defendants, in their individual and official capacities, under color of law, and in the course and scope of their employment, the Plaintiff seeks the following:

A.    Compensatory damages for lost wages, emotional and mental distress, and other pecuniary damages, in an amount to be determined at trial, up to the maximum allowable under law.

B.    Punitive damages against individual Defendants for conduct evidencing a reckless disregard for, or deliberate indifference to, Mr. Clark's well-being and his well-established constitutional rights, in an amount to be determined at trial.

C.    All costs and expenses associated with bringing this action against Defendants, as well as reasonable attorney fees under 42 U.S.C. § 1988.

D.    Injunctive relief to prevent further dissemination of the false statements by

Defendants and to remedy the verifiably false statements already published.

E.    Such other relief to which the Plaintiff is entitled, and which the Court deems just,

fair and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

DATED: July 30, 2025

Respectfully submitted,

_Michael Scott Clark_
Michael Scott Clark
142 Burne Run
Madison, MS 39110
MS Bar No. 6269
Tel: 601-421-1262
msclark88law@gmail.com

ATTORNEY FOR PLAINTIFF